# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed June 16, 1911.

AARON ROSENBERG, PLAINTIFF,
VS.
ARCHIE C. MURRAY ET AL.,
DEFENDANTS.

*S. S. Field, Jacob J. H. Mitnick, D. Eldridge Monroe* and *Maloy & Brady* for plaintiff.

*Bernard Carter & Sons, J. Craig McLanahan* and *R. Vernon Badger* for defendants.

STUMP, J.—

The plaintiff's bill is for specific performance of an alleged contract to sell to the plaintiff two improved lots in Baltimore City, known as Nos. 313 and 321 North Eutaw street.

The title involved is leasehold in all of No. 321 and leasehold in all of No. 313 except a small portion of its area, which is in fee-simple.

At the time of the execution or creation of the alleged contract, the two lots in question were owned by four of the defendants, as tenants in common, namely, Archie C. Murray, William H. C. Murray, Mary H. Vawter, a sister, and Milton Murray.

The contract came into existence on December 8th, 1910, at William's Wharf in Mathews County, Virginia.

The parties to the bill were then living where they still reside.

Archie C. Murray lived together with his wife, Hattie R. Murray, in Baltimore City. William H. C. Murray and his brother Milton Murray and Mary Hester Murray and Georgieanna Mur-

ray, their respective wives, lived at Williams' Wharf, Virginia, already alluded to. Mary H. Vawter resided with her husband John W. Vawter in the State of Indiana. All the parties to the proceeding and also the husband of Mary H. Vawter were of legal age at the time the contract arose for the sale of the said two lots which might be called family property.

Under a bill for specific performance the first consideration is the identification of the real contract between the parties, if any exists.

In this case the real contract between the parties is in this court's opinion found, when read in the light of the circumstances appearing from the evidence, to have surrounded their execution, in the three papers marked respectively "Plaintiff's Exhibit No. 4," "Plaintiff's Exhibit No. 5" and "Defendants' Exhibit No. 13."

These papers are all dated December 8th, 1910. Said Exhibit No. 4 is on its face called an agreement and provides for the sale of the two lots to plaintiff for $28,000, and is signed by all the owners of the lots except Archie C. Murray, and omits the signature of the latter's wife, and of the husband of Mary H. Vawter, John W. Vawter, who is not a party defendant, although spaces with seals are left on the paper for, apparently, said three signatures and the body of the paper makes all three of the persons whose signatures are lacking parties to the "agreement" as it is designated. Said Exhibit No. 5 is of a receipt for $1,200 from plaintiff and signed by William H. Murray and Mary H. Vawter and Milton Murray "for myself and Archie C. Murray" and professing to be the first payment of purchase money for said two lots and further recites amongst other things that said purchase is fully set forth in the agreement herein designated as Exhibit No. 4. Said Exhibit No. 13 is a telegram or the original thereof admitted to be in the handwriting of Archie C. Murray, aforesaid, one of the defendants and co-owners, and signed by himself, which reads as follows, and was admitted to have been received from Baltimore by his two brothers and sister, the other owners, about 11 o'clock A. M., on December 8th, 1910, at Williams' Wharf, before they signed Exhibits 4 and 5 on the same day.

"Thursday, 8th December, 1910.

:"To Milton Murray,
  "Williams' Wharf,
      Mathews County, Virginia.

"I have offer of thirty two thousand dollars net from Samuel Siegel, and I won't sign unless highest net offer be accepted. We must accept the highest bid.
          "Archie C. Murray,
    "1125 Linden avenue, Baltimore."

The defendants naturally were anxious to secure the highest possible price for their lots and the plaintiff who still occupies No. 313, where he has as a tenant carried on his business of supplying ladies' clothing for nine years, was anxious to buy as he testified because of what he considered an established stand for said business, and it is conceded that defendants, or one of them, told him the owners would not sell No. 313, unless he at the same time bought No. 321, with which plaintiff had never had any business connection.

The position of the defendants that upon receipt of the above telegram they were induced to refrain from taking steps to endeavor to sell to Siegel for the $32,000 by the representations fraudulent or otherwise, directly or indirectly, made to them on that day by the plaintiff is untenable for the evidence as a whole touching Siegel and these defendants, and the testimony of the defendants themselves, or of some of them, is convincing that the defendants then at Williams' Wharf had lost confidence, if they ever had any, in Samuel Siegel, and preferred to deal with the plaintiff at $28,000 than to take chances of opening negotiations or taking steps at that time looking to closing a bargain with Samuel Siegel at $32,000. The court, however, in these comments, is not considering the question of justification on the part of the defendants alluded to for their attitude at that time, December 8th, 1910, towards Samuel Siegel in relation to the property.

Exhibits Nos. 4 and 5 were executed on December 8th, 1910, at Williams' Wharf after practically an all-day conference and preparation in the house of one of the owners, with the plaintiff and his counsel participating, and after the dismissal or departure of several

representatives of other persons wishing to buy. These other possible purchasers and the plaintiff had been previously advised by Archie C. Murray to go to Williams' Wharf to negotiate with the other three owners. The plaintiff and his wife and two of his employees at his store, testified that Archie C. Murray had previously and just recently before that day said that whatever the others at Williams' Wharf did would satisfy him and his wife. Archie C. Murray in denying this says he thinks he said to the plaintiff or his wife that he would probably join in what his brothers and sisters did as to the property.

Exhibit No. 5 will be referred to herein for brevity as the "Receipt," although it is as intimated one part of the contract as identified by the court.

This receipt is signed in part by Milton Murray for himself and his brother Archie C. Murray.

The witness John Morton who at one time collected from plaintiff rent for the store occupied by plaintiff and who had conversations previous to the 8th of December, 1910, with Archie C. Murray with reference to the sale of the said two lots, and whose testimony is unimpeached testified with positiveness that on more than one occasion Archie C. Murray, said that he would be satisfied with whatever his brother. Milton did about the property, meaning in reference to the price for sale.

Assuming that these declarations were made to the plaintiff just prior to his leaving Baltimore for Williams' Wharf, and that they in part influenced him to go, or that without them even he would not have gone, and that previously they were made to the other witnesses, yet this court is of the opinion that such did not bind Archie C. Murray to part with an interest in land through the subsequent Exhibit 4, called agreement, and the receipt signed by his brother for him, when we consider what we cannot overlook, the telegram of December 8th, 1910, a positive refusal to sign for a less price than $32,000. The Statute of Frauds has well thrown safeguards about the parting with title to land, and where the owner of an undivided interest has merely promised orally some third person who is anxious and ready to make every effort to buy the whole that if such third person will take the trouble and expense to go to his co-owner that he will sell for whatever sum the co-owner will say, and that, too, when he has confidence in the co-owner, it would be a hardship merely because the third person had gone, to deny the owner the right to recall his promise before the co-owner had acted. Such would, it seems, throw open the door to imposition from collusion or other improper conduct, to say nothing of depriving the owner of an opportunity to withdraw his confidence in the co-owner on grounds acquiring subsequently to the oral promise, but before the action of his co-owner. The remedy of the third person, if he has any, must be at law. This applies to where all authority has been withdrawn, but such is not the fact in this case.

Without regard to any alleged subsequent contract by these owners for the sale of these lots to persons other than the plaintiff, and confining ourselves to the transactions with the plaintiff, we see in the receipt evidence that all the owners of Williams' Wharf on December 8th, 1910, and the plaintiff and his counsel regarded the transaction in question as a closed book.

The three owners who were there, and signed both the agreement and receipt, Wm. H. Murray, Milton Murray and Mary H. Vawter, all separately notified Archie C. Murray that day or the next, that the transaction was closed at $28,000, and Mrs. Vawter so notified Mr. Leakin by letter, and stated that they had sold the property to their nine-year tenant.

On the second day after, the plaintiff's counsel presented the paper called agreement to Archie C. Murray for signature, stating that he did not consider it essential, but the signature was refused. The defendant, Archie C. Murray, had, however, in the meantime, been approached by other outside agents or persons with reference to a larger price or offer for the property. The contract in this case must be dealt with independently of any subsequent binding offers or papers on their face binding contracts of sale and purchase at a higher price and appear to be inadmissible for other than the purpose of showing motive for some of the conduct of the defendants subsequent to the 8th of December, 1910, the time of the formation of the contract in issue.

Up to the conclusion of the contract with the plaintiff the efforts and expressions of the defendant, Archie C. Murray, all tended in the direction of sending all possible purchasers of this property to his brothers and sister at Williams' Wharf for the purpose of buying. He set no value upon it in Baltimore for any one who approached him and left all under the impression that to actually do business they must go down into the State of Virginia, not to meet him and the other owners, but to meet there the other owners where from the drift to the testimony the sale was to take place and money would be well taken along for part payment of purchase price or on account.

The day was even designated, Wednesday, December 7th, 1910, when this sale was to take place and other possible purchasers or their agents actually gathered there on that day and remained there; some of them at least, until December 8th, after plaintiff arrived, and a telegram from plaintiff in substance, asks them at Williams' Wharf to delay sale until he could get there on the 8th, the day he did afterward arrive.

This same defendant gave persons the names and addresses of his brothers and sister at Williams' Wharf and discussed the way to reach the point in connection with that definite day, Wednesday, December 7th, 1910.

So that when the morning of Thursday, December 8th, 1910, arrived he was well posted on conditions at Williams' Wharf, for he had largely participated in bringing them about and he had conversation with one of his co-owners over 'phone that very day.

He knew that plaintiff was there with money in his pocket anxious to buy and must have known from his own prior conversations with plaintiff, that plaintiff had reasonable expectations of success if he should comply with the terms the co-owners at Williams' Wharf fixed.

It was under these circumstances that Archie C. Murray on the morning of the 8th of December, walked to the Richmond Street telegraph office with Samuel Siegel, one of plaintiff's rivals as competitors at that time for the control of this property, and wrote and signed the telegram to his brother, Milton, referred to herein as "Defendants' Exhibit No. 13."

It appears, however, that the offer referred to was merely verbal and that Siegel was bound to no one upon it, and it is contended by the plaintiff that it was designed by the sender to assist those at Williams' Wharf in pushing up the purchase price on the plaintiff. The fact remains that notwithstanding the receipt of this message the brothers and sister closed with plaintiff for a total of $28,000, and Milton Murray receipted for himself and Archie C. Murray for the payment on account. Outside of the real motive that prompted the sending of the telegram on the part of Archie C. Murray and Siegel's presence at the time, and looking at the substance of it much may be read between the lines. In the first place Siegel ran no risk and stood a chance thereby of at least interfering with a probable closing with plaintiff.

In the next pace, had Siegel's alleged offer been a binding one and conceding him to have been financially responsible as he probably was, the telegram did not mean that Archie C. Murray wanted to sell to Siegel but in substance that his directions to his brother Milton were modified only to the extent that he, the sender of the message, would not be satisfied without realizing for himself out of the sale as much, to wit: $8,000, as if the property were sold to Siegel on the offer of $32,000. Milton Murray's actions in writing with his sister and brother and closing with the plaintiff, and signing the receipt for his brother for the part payment of purchase money after receiving the telegram, whether he made known to the plaintiff or not its contents, made him a guarantor that his brother should receive from him, if he demanded it, as much of the $28,000 purchase money as if the property had been sold to the plaintiff or another for $32,000.

The telegram is further evidence over the sender's own signature, or written evidence of his brother Milton's authority to act for him previously designated, and the word sign used in the message does not have to be taken literally and as evidence of any necessity for the signature of Archie C. Murray to the paper called "Agreement," but taking the telegram on its face, the words "I won't sign," meant nothing more than that he would not, perhaps, execute the deed, or would not be satisfied, for that was all the sender could then have had in mind words merely to express dis-

approval of any other sum than $8,000 for himself. Consequently, the statute seems to be gratified as to all four of the tenants in common of this property, and as to the wives of both William H. C. Murray and Milton Murray.

The questions raised by the absence from the papers of the signatures of the wife of Archie C. Murray and the husband of Mary H. Vawter, will be considered presently.

After the transactions of December 8th, the defendants had the enforcement of the purchase by plaintiff, had occasion arisen, within their own control.

From that day it was the duty of those of the owners at Williams' Wharf, including Mrs. Vawter, to write with the plaintiff and use every effort to have the deed executed to the plaintiff within the prescribed time, instead of which we have offered in evidence a writing on its face a sale to another and undisclosed person at a higher price signed not only by Archie C. Murray but by both his brothers and sister. The vision of a higher price seems to have shut from the view of these defendants their obligations to the plaintiff and themselves and circumstances often cause inexperienced persons to unintentionally wrong others.

On the Sunday following the Thursday of the 8th of December, we find Archie C. Murray's sister and one of his brothers arriving in Baltimore and met with an automobile by a representative of some one who sought a contract from these owners although cognizant of what had transpired at Williams' Wharf.

Without ascribing any intentional wrongdoing or fraudulent motives on the part of any of the parties to this cause it would seem to work a hardship upon the plaintiff to grant him no relief in the light of larger prices subsequently offered for some reason unknown to the court when it is apparent that had no suggestions of higher prices arrived the plaintiff could, and probably would, have been forced to perform if unwilling so to do within the prescribed time.

We now reach the question of the plaintiff's rights against John W. Vawter, the husband of the defendant, Mary H. Vawter, or concerning his rights in the property as such husband.

There is no evidence of agency to affect his interest, and nothing to show his consent to, or ratification of, the contract in issue, and hence the plaintiff must take, if he desires to take, with this interest outstanding.

As to the inchoate or contingent right of the wife of Archie C. Murray, there is no sufficient evidence to bind her. As contrasted with her husband, no one has signed for her, and she has signed nothing for herself connected with the transaction.

Every precaution should, in this court's opinion, be taken to avoid forcing away from the owner title to the land.

The statute should be followed. The opinion in Barbour vs. Hilkey, in 24 L. R. A. 768, furnishes the safest and better authority to be followed in this State upon the two questions there discussed, and consequently the plaintiff will be decreed entitled to a deed from the defendants for the property involved upon his compliance with the terms, exclusive of the contingent interest of one of the defendants, the wife of Archie C. Murray, and of John W. Vawter, the husband of Mary H. Vawter.